## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Deidre L. Monroe
Gary, Indiana

ATTORNEYS FOR APPELLEES

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorney General
Indianapolis, Indiana

Donald W. Wruck
Wruck Paupore, PC
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re Matter of:

Ta.A., Tr.A., and A.M. (Minor Children):

R.A.,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services and Lake County Court Appointed Special Advocate,

*Appellees-Petitioners.*

March 27, 2015

Court of Appeals Case No. 45A03-1410-JT-361

Appeal from the Lake Superior Court.

The Honorable Thomas P. Stefaniak, Jr., Judge.

Cause Nos. 45D06-1307-JT-150, 45D06-1307-JT-160, & 45D06-1307-JT-161

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, R.A. (Mother), appeals the trial court's Order terminating her parental rights to her minor children, Ta.A., Tr.A., and A.M. (collectively, Children).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the Indiana Department of Child Services (DCS) presented sufficient evidence to support the termination of her parental rights.

## FACTS AND PROCEDURAL HISTORY

Mother and T.J. are the biological parents of Ta.A, born May 5, 2005; Mother and T.H. are the biological parents of Tr.A., born October 14, 2006; and Mother and R.M. are the biological parents of A.M., born October 30, 2008.[1] In addition, Mother has three older children: R.A., born December 23, 1995; W.A., born August 14, 1998; and L.A., born June 6, 2002.[2]

---

[1] Throughout these proceedings, the whereabouts of T.J. and T.H. were unknown, so their paternity was never conclusively established. Nevertheless, on September 18, 2014, the parental rights of T.J., T.H., and R.M. were terminated. None of the fathers are party to this appeal.

[2] Although DCS removed R.A., W.A., and L.A. from Mother's custody concurrent with the other three Children, their wardship cases have proceeded separately. R.A., W.A., and L.A. are not part of this appeal, but facts pertaining to them will be provided as necessary.

[5] On July 6, 2011, the DCS office in Lake County, Indiana, received a request for assistance from the Gary Police Department regarding a twenty-nine-year-old Mother and her six children. The report indicated that Mother was being evicted because the home she shared with her mother, C.G. (Grandmother), had been condemned. Mother stated to the police officer that she wanted to "give up" four of the children because she could no longer take care of them. (DCS Exh. A). DCS arrived a short time later, but Mother's sister and a family friend had already agreed to each take three of the children while Mother moved into a new house. DCS scheduled an appointment to inspect the new home once the children had returned to Mother's custody.

[6] Before DCS could inspect the new house, on July 20, 2011, Mother contacted DCS and reiterated that she was unable to care for her children. Per Mother's request, DCS took the children into custody and placed them in foster care. DCS learned that all six children had been sharing a bedroom with Mother; that Grandmother smokes crack cocaine and forced the children to "hustle" the money to pay for her drugs; and that Grandmother would hit the children with a broomstick and was verbally abusive. (Tr. p. 18). Mother also admitted to DCS that she used marijuana. The next day, DCS filed a petition alleging each of the Children to be a child in need of services, and the trial court subsequently adjudicated them as such.

[7] At the dispositional hearing on August 17, 2011, the trial court ordered Mother to participate in the services recommended by DCS and to have supervised visitation with the Children. As part of its plan to reunify Mother and the

Children, DCS referred Mother for a substance abuse assessment and counseling, random drug screens, and both individual and family counseling. DCS also provided home based case management services to assist Mother with securing appropriate housing and employment and to ensure that Mother had transportation for visitation and other appointments. Initially, Mother fully cooperated with her case plan. She completed parenting classes, and by the beginning of 2012, Mother had moved into her own apartment. Thereafter, Mother received unsupervised visitation privileges with the Children.

[8]     Despite her early progress, on April 17, 2012, Mother tested positive for cocaine. As a result of the failed drug screen, DCS requested that her visitation with the Children be supervised. The next month, Mother passed all of her drug screens, so DCS restored unsupervised visitation at the beginning of June 2012. Less than three months later, Mother was evicted from her apartment. She moved back into Grandmother's home, but it was not long before Grandmother also kicked her out. On September 18, 2012, Mother informed DCS that she had relocated to Indianapolis, Indiana. However, Mother returned to Lake County the following month and resumed her services with DCS. On October 26, November 14, and November 27, 2012, Mother's drug screens yielded positive results for marijuana. In addition, Mother was again living with Grandmother and had not made any progress in finding her own housing. Thus, on December 19, 2012, the trial court changed the permanency plan from reunification to termination of Mother's parental rights.

[9] Between their removal in July of 2011 and February of 2013, DCS kept the Children placed together. This resulted in the Children being shuffled to numerous foster homes because of the aggressive and disturbing behaviors they exhibited. In addition to physically fighting with each other, attacking their foster parents, destroying property, and misbehaving in school, the Children engaged in inappropriate behavior of a sexual nature. On February 8, 2013, the Children were individually placed with separate foster families. The Children still visit with each other twice per month, but since their separation, they have made drastic improvements behaviorally, emotionally, and academically. The Children are currently placed with foster parents who intend to adopt them.

[10] Following the change in her permanency plan from reunification to termination, Mother began encouraging the Children to disobey their foster parents. As a result, on March 14, 2013, DCS requested that all of Mother's services, including visitation, be discontinued, which the trial court granted on April 10, 2013. After her services were terminated, Mother did not maintain contact with DCS. Two years after the Children's removal, on July 17, 2013, DCS filed a petition to terminate Mother's rights. On September 17, 2014, the trial court held a termination hearing. On September 18, 2014, the trial court issued its Order, stating that "[i]t is in the best interest of the [Children] and their health, welfare and future that the parent-child relationship between the [Children] and their parents be forever fully and absolutely terminated." (Appellant's App. p. 3).

[11] Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[12]  Mother claims that DCS presented insufficient evidence to support the termination of her parental rights.[3] It is well established that "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)), *reh'g denied*. Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children" against undue government interference. *Id.* However, when a parent is "unable or unwilling to meet" his or her parental duties, it may become necessary for a court to terminate his or her rights to the child. *Id.* at 1259-60.

[13]  The involuntary termination of a parent's rights "is the most extreme sanction a court can impose" because it permanently severs the parent-child relationship. *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013). Nevertheless, the ultimate purpose of termination is to protect the children involved—not to punish the parents. *Id.* Therefore, the termination of parental rights is meant to be a last resort, available only after "all other reasonable efforts have failed." *Id.*

---

[3] As noted by the State, Mother's argument is devoid of any citations to the record and contains insufficient citations to authority pursuant to Indiana Appellate Rule 46(A)(8)(a). Waiver notwithstanding, because of the significant interests at stake in a termination of parental rights, we will address the merits of this case.

## I. *Standard of Review*

When reviewing a termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and any inferences which may reasonably be derived therefrom that are most favorable to the trial court's judgment. *Id.* Where, as here, a trial court enters specific findings of fact and conclusions thereon, we will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). To evaluate whether the trial court's decision to terminate Mother's parental rights is clearly erroneous, we must consider "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *K.T.K.*, 989 N.E.2d at 1229-30.

## II. *Sufficiency of the Evidence*

In order to support the involuntary termination of a parent's rights, DCS was obligated to prove, in pertinent part,

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must establish each of these elements by clear and convincing evidence. *In re M.W.*, 943 N.E.2d 848, 854 (Ind. Ct. App. 2011), *trans. denied*. "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

### A. *Conditions Resulting in Removal Not Remedied*

First, Mother contends that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in the Children's removal and placement in foster care will not be remedied. In making this determination, a trial court should assess the "parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. This entails an evaluation of "the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* The trial court "may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment[,]" as well as the parent's response to any services offered by DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[18] In this case, DCS removed the Children from Mother's care due to her unstable housing, substance abuse, and admitted inability to provide adequate care and supervision. Mother now contends that the trial court erroneously concluded that there is a reasonable probability that these conditions will not be remedied because she "complied in totality with her case plan." (Appellant's Br. p. 10). We disagree.

[19] In its Order terminating Mother's parental rights, the trial court acknowledged that the Children "were to begin transitioning home in early 2012" based on Mother's initial compliance with her DCS services. (Appellant's App. p. 2). The trial court also found that Mother subsequently tested positive for cocaine and marijuana, lost her housing, and

> [s]ince that time, [M]other stopped complying with any of the services. Mother was having inappropriate contact with the [C]hildren. Mother was encouraging the [C]hildren to act out in their foster homes. Mother violated the rules and actually slipped [L.A.] a cell phone and was encouraging the child to call [M]other's boyfriend. Mother became verbally abusive to the service providers. Mother was again unstable and not participating in the services offered. All services were stopped for [M]other in April 2013, after two years of attempted services. Mother did not progress in her services and continues to this day to lack stability. Mother still does not have appropriate housing.

(Appellant's App. p. 2). Mother argues that several of the court's findings are unsupported by the evidence "under the requisite evidentiary standards." (Appellant's Br. p. 9).

[20] First, Mother asserts that the trial court erroneously "failed to give any weight to [her] honesty, and although she had been submitting to random drug screens

for two (2) years she only tested once admittedly for marijuana, and a disputed positive cocaine test." (Appellant's Br. p. 9). Our deference for the trial court's determinations of evidentiary weight and witness credibility is long settled; thus, to the extent that Mother's argument is a request that we reweigh evidence in her favor, we decline. *See In re B.J.*, 879 N.E.2d 7, 14, 19 (Ind. Ct. App. 2008), *trans. denied*. Considering the evidence most favorable to the judgment, it is clear that Mother tested positive for cocaine in April of 2012, and for marijuana on October 26, November 14, and November 27, 2012. Mother conceded that she smoked marijuana but disputed the validity of the cocaine result. Notwithstanding that it was a hair follicle drug screen that yielded the positive cocaine result, she speculated that her urine sample must have been switched because she had "never used drugs a day in [her] life." (Tr. p. 51). As the trial court clearly disbelieved Mother, we find that the evidence sufficiently establishes that she did not remedy her substance abuse problem.

[21] Second, as to the trial court's finding that Mother had inappropriate contact with the Children and was verbally abusive to service providers, Mother asserts that the trial court "failed to take into consideration the stress [she] was under with the constant involvement of the DCS without any progress being made in the returning of her [C]hildren." (Appellant's Br. pp. 9-10). We find little merit in Mother's attempt to use stress as an excuse to sabotage the Children's progress in foster care and to shout obscenities at service providers. Our court has previously found that "[a] pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction

with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re B.J.*, 879 N.E.2d at 18. Here, DCS' ongoing involvement and the lack of progress were the direct result of Mother's non-compliance with her case plan.

[22] Lastly, regarding Mother's inadequate housing, she asserts that the trial court "ignored the testimony by [M]other and the case manager regarding the money she receives from Social Security, and her inability to pay rent and utilities, especially without having the custody of her [C]hildren." (Appellant's Br. p. 10). At the termination hearing, Mother testified that she lost her apartment because her rent exceeded her Social Security disability benefits, which is her sole source of income. In turn, DCS explained that Mother's

> main issue was unstable housing. And when we put in the home based case management, they help with all of those things. With the transportation, . . . they take you to the different housing places that work with you according to your income, so even though if she is on a fixed income of social security benefits from disability, there are housing options out there for you, because they base your rent off of what your income is. So, the home based services put in place were designed specifically to address her main issue which was not being able to provide housing for herself or her [Children].

(Tr. pp. 63-64).

[23] Ultimately, the trial court found that DCS' goal

> was to obtain stability for the [M]other. Mother was given rental assistance and still [M]other could not maintain stable housing. . . . Home based services were put into place to help [M]other obtain housing and stability. Mother questioned the need for any of the

services. Mother often times would refuse services. Numerous attempts were made to get [M]other vested in the services.

(Appellant's App. p. 2). The evidence establishes that at the time of the termination hearing, Mother was living with Grandmother. Mother testified that Grandmother is "not on drugs no more and we gets (*sic*) along fine now." (Tr. p. 109). However, the trial court specifically found no credibility in Mother's assertion that she and Grandmother have improved their relationship. Furthermore, DCS stated that Mother's current housing would not be an appropriate placement for the Children "[b]ecause of the [G]randmother's past cocaine/crack abuse and the allegations of the [C]hildren with her physically and emotionally abusing them while living in her home." (Tr. p. 74).

[24] While the fact "of low or inconsistent income" does not, by itself, demonstrate unfitness, it is not an excuse to neglect a child or expose a child to a dangerous home environment. *In re B.D.J.*, 728 N.E.2d 195, 202-03 (Ind. Ct. App. 2000). Mother testified that she "can't get a job" because she receives Social Security disability, but it is Mother's responsibility to supplement her income in order to support her Children. (Tr. p. 48). She cannot reasonably expect that DCS will financially support her and the Children for the rest of their lives. Moreover, we are unpersuaded by Mother's attempt to shift the blame for her instability, arguing that DCS "set [her] up for failure by putting her into a rental unit that exceeded her only income." (Tr. p. 78). "[T]he law concerning termination of parental rights does not require [DCS] to offer services to the parent to correct the deficiencies in childcare." *In re B.D.J.*, 728 N.E.2d at 201. DCS offered to

help Mother find suitable housing, but it was ultimately Mother's duty to ensure that she could maintain a stable environment for the Children.

[25] Despite her initial compliance, and despite a multitude of services offered to Mother over a twenty-month span, Mother did not comply "in totality with her case plan" because she did not have stable housing for the Children, she had not pursued any other means for supplementing her income; and she did not achieve sobriety. (Appellant's Br. p. 10). Therefore, we find that the evidence sufficiently supports the trial court's determination that the conditions resulting in the Children's removal from Mother's custody are unlikely to be remedied.[4]

### B. *Best Interests of the Children*

[26] Next, Mother contends that DCS failed to prove that termination of her parental rights was in the best interests of the Children. In evaluating a child's best interests, the trial court must consider the totality of the evidence, "look[ing] beyond the factors identified by [DCS]." *In re B.J.*, 879 N.E.2d at 22. The trial court need not postpone termination of the parent-child relationship until after a child has been irreversibly harmed, "such that the child's physical, mental and social development is permanently impaired." *K.T.K.*, 989 N.E.2d at 1235. "When assessing the child's physical, emotional and mental well-

---

[4] Having found that DCS met its burden to prove that the conditions resulting in the Children's removal will not be remedied, we need not address whether the continuation of the parent-child relationship poses a threat to the Children's well-being. *See K.T.K.*, 989 N.E.2d at 1234 (citing I.C. § 31-35-2-4(b)(2)(B)(ii)). Additionally, Mother concedes that DCS has established a satisfactory plan for the Children's care and treatment. *See* I.C. § 31-35-2-4(b)(2)(D).

being, the trial court may consider a myriad of factors. We acknowledge that among those factors contemplated, '[p]ermanency is a central consideration in determining the [child's] best interests. . . .'" *Id.* (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265).

[27] During the termination hearing, both the DCS case manager and the Children's therapist recommended that termination of Mother's parental rights was in the Children's best interests because of their need for structure and stability. Specifically, DCS described that

> [Tr.A.] has been in seven different foster homes. [Ta.A.] has been in seven different foster homes. [A.M.] has been in six. And these [C]hildren are nine, seven and five years old. They are all in pre-adoptive homes who have . . . gotten them kind of stabilized. The [C]hildren's behaviors have diminished tremendously, if not completely, in the homes that they are in and they need to be in homes where they could have a permanent, stable home environment for them to grow into mature and productive adults.

(Tr. p. 69). The trial court agreed, further finding:

> None of the parents are providing any emotional or financial support for the [C]hildren. . . . Mother continues with her instability and is in no position to properly parent these [C]hildren. The [C]hildren have been in placement since July 2011 and have never been returned to parental care or custody. The [C]hildren are bonded and thriving in their placements.
> . . . Additionally, the [C]hildren deserve a loving, caring, safe, stable and drug free home.

(Appellant's App. p. 3). Mother's basis for error on appeal is that "the trial court failed to address the pain and suffering that the [C]hildren will have to

suffer when they realize[] that they will not have any further contact with . . . [M]other." (Appellant's Br. p. 11).

[28] This court is ever mindful "that children should not be compelled to suffer emotional injury, psychological adjustments, and instability to preserve parental rights." *In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). What Mother fails to recognize is the pain and suffering that the Children have already endured because of her actions. In particular, the trial court found that

> [t]he [C]hildren have a lot of behavior[al] issues that are currently being addressed. The [C]hildren cannot be placed together due to the extreme behaviors of the [C]hildren. The [C]hildren have sexual abuse issues and physical abuse issues. The [C]hildren cannot be placed together due to the sexual abuse issues the [C]hildren have portrayed.

(Appellant's App. p. 2). A review of the record reveals that "the [C]hildren reported to their therapist at one point[] that they had been subjected to sexual abuse and physical abuse while in the home with their [M]other . . . . And also that they had been witness to sexual acts between their [M]other and different male visitors." (Tr. pp. 72-73). The Children's therapist, who observed the Children acting out "sexualized behaviors" and making sexually inappropriate comments, opined that they were exhibiting symptoms of past abuse and neglect. (Tr. p. 94). Although Mother denied the allegations, postulating that "it probably happened [when] they got into foster care[,]" the trial court was free to discredit her testimony. (Tr. p. 117).

[29] Between July of 2012 and October of 2013, the Children met individually with a therapist on a weekly basis in order to address their anger and other issues. The therapist reported that the Children "didn't have a lot of structure, they didn't recognize boundaries, and they were a little defiant and sometimes they could be disrespectful." (Tr. p. 91). However, by the time of the termination hearing, they "had more initiative, wanted to try to do better in school and get along with others." (Tr. p. 96). Ta.A. "indicated that she would be willing to stay long term" with her foster parent. (Tr. p. 70). Tr.A.'s grades and behavior had improved, "and he has developed a nurturing and loving bond with [his foster parent]. And he intends to stay there, if you ask [Tr.A.]. He's happy where he's at." (Tr. pp. 70-71). As for A.M., she is happy and thriving and "has a great bond with [her foster] parents." (Tr. p. 71).

[30] In addition to the Children's need for permanency and structure, the record reflects that Mother exposed the Children to dangerous and inappropriate situations, which "detrimentally impacted [their] psychological, emotional, and physical development." *K.T.K.*, 989 N.E.2d at 1235. The therapist expressed concern that if the Children "go back to a life where there's no structure, they don't know where their next meal, or where they are going to lie their head, then I believe their behaviors will increase. And they will go back to doing the things that they were doing before." (Tr. p. 97) She noted that they would be subject to "an increased risk of getting into criminal activities, possible early pregnancies, it could just hinder their emotional stability." (Tr. p. 97).

Accordingly, we find that sufficient evidence supports the trial court's conclusion that termination of Mother's rights is in the Children's best interests.

[31] As a final note, we must address Mother's diatribe that

> DCS'[] objective should not be to cause measurable pain and suffering on young children. These young [C]hildren should be afforded the opportunity to be raised or at least have a relationship with their natural [M]other. Moreover, [Mother] has older children and may have other children. The siblings should have the fundamental right to have a relationship with their older siblings. The [c]ourt must make a stance in ruling that parents have fundamental rights that are protected by the U.S. Constitution. The continued destruction of the family structure should not be tolerated by this [c]ourt. This [M]other has a right to raise her [C]hildren. . . . The [c]ourt must stop the direct assault on the rights of parents in the State of Indiana.

(Appellant's Br. p. 11). Our holding in this case does not undermine the fact that parents have a fundamental liberty interest in raising their children. Nonetheless, parental rights must be subordinated to the State's interest in protecting a child's welfare. *In re G.Y.*, 904 N.E.2d at 1259.

Here, Mother was afforded with three years and ample assistance from DCS to achieve stability, but she selfishly refused to make the needs of her Children a priority. Instead of accepting responsibility for her own actions, Mother has placed the blame everywhere except for where it truly lies, which is with her. We are unsympathetic to Mother's portrayal of herself as the victim because it is the *Children* who have paid the price for her poor choices. Mother—not DCS or the courts—is responsible for the destruction of her family.

## CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the termination of Mother's parental rights to the Children.

Affirmed.

Vaidik, C. J. and Baker, J. concur